IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  04-cv-00363-EWN-OES (Consolidated with 04-cv-00840-EWN-OES)

PAM FORAKER, and
LARRY SCHMIDT,

Plaintiff(s),

v.

JAMES R. SCHAUER, et al.,

Defendant(s).

ORDER GRANTING DEFENDANTS'
MOTION TO EXCLUDE EXPERT TESTIMONY
AND
ORDER DENYING PLAINTIFFS'
MOTION TO AMEND AND ADD ADDITIONAL EXPERT

ORDER ENTERED BY MAGISTRATE JUDGE O. EDWARD SCHLATTER

**INTRODUCTION AND PROCEDURAL BACKGROUND**

This is an employment discrimination case that was filed by two former employees of Fremont County.  Both plaintiffs were simultaneously terminated from their employment with the County.  On August 24, 2005, District Judge Edward W. Nottingham ruled on defendants' Motion for Summary Judgment, and as a result of his ruling the claims remaining for both defendants are claims for denial of procedural due process under 42 U.S.C. § 1983, and breach of contract.  Additionally, plaintiff Pam Foraker has a third claim remaining for denial of liberty interest under § 1983.

Plaintiff retained an expert named Jerry D. Boswell, D.B.A., CFA ("Boswell"), to evaluate plaintiffs' damages, and to offer opinions with regard to their monetary losses. His combined report with regard to both plaintiffs was prepared, and presumably submitted to defendants, on September 10, 2004. *See* Defts' Mtn Excl, Ex. A.

Defendants deposed Boswell on October 22, 2004. On November 30, 2004, plaintiffs provided to defendants a document prepared by Boswell that plaintiffs have entitled "Amendment Sheet." Id., Ex. D. The Amendment Sheet is 6½ pages long, and contains various corrections and additions to the substance of the answers that were given by Boswell during the course of his deposition. Additionally, on or about the same date, defendants state that they received from plaintiffs a one-page document entitled "Opinion (Revised)," which purported to be further changes by Boswell to his opinion, but which is a bare one paragraph long, with no explanations for the changes. Id., Ex. B, *and see* text of mtn at 22. Finally, on January 27, 2005, Boswell prepared and submitted yet another report, this one entitled "OPINION, Revised as of January 27, 2005." Id., Ex. E.

On March 1, 2005, defendants filed ther Motion to Exclude the testimony of Boswell from trial. In their motion, defendants challenge the methodologies and calculations employed by Boswell, as well as the absence of data for certain of his conclusions. Plaintiffs filed their Response on April 15, 2005, and defendants their Reply on May 9, 2005. I took the motion under advisement pending the resolution by

Judge Nottingham of defendants' Motion for Summary Judgment.

On August 17, 2005, plaintiffs filed their "Motion to Amend Preliminary Pretrial Order and to Name an Additional Expert Witness."  In this motion, plaintiffs state, "[i]n view of the fact that Defendants have challenged the qualifications, competence and conclusion of [Boswell], the Plaintiffs have retained another expert to do a similar analysis of the past and future wage losses of the Plaintiffs."  Pltfs' Mtn Am. at 2, ¶ 5. Plaintiffs assert in their motion that they "wish to retain a second expert to substantiate the conclusions of Dr. Boswell which have been challenged or to use him as a replacement for the originally named expert."  Id., ¶ 6.

Defendants have asked for a hearing on their Motion to Exclude, to which plaintiff objected.  I conclude that the matter has been adequately briefed, and no hearing is necessary.

**Summary of ruling.**  I conclude that plaintiffs have failed to provide any basis upon which to justify the submission of their expert's "Amendment Sheet" or "revised opinions," and I will disregard the contents of those documents.  Based upon the testimony contained in Boswell's original opinion and deposition testimony, I conclude that his opinions are not competent or reliable, and I will grant defendants' Motion to Exclude Boswell as an expert.

I will deny plaintiffs' requests either to designate an additional expert, or to substitute an expert for Boswell.

## BOSWELL'S "AMENDMENTS" TO TESTIMONY

3

**1**

**Boswell's "Amendment Sheet."** Plaintiffs' "Amendment Sheet" apparently is intended as an errata sheet that was submitted pursuant to the provisions contained in Fed.R.Civ.P. 30(e).  The nature of Boswell's two "revised" opinions is never explained.

Defendants offer their objection to Boswell's corrections and additions at pages 21-22 of their Motion.  They assert that Boswell's purported modifications are "lacking any explanation whatever of the basis for any such modifications."  Defts' Mtn Excl. at 22.  Defendants state that "[m]ost if not all, of these changes came about as the result of matters brought to Dr. Boswell's attention during his deposition," and they argue that "[i]t is not the job of the defense to correct all of Dr. Boswell's errors and miscalculations and then allow him to issue corrected reports only after his errors are uncovered by the defense."  Id.

In response, plaintiff asserts that Boswell's changes to his report and testimony were not "improperly made."  Plaintiff argues further:

> This is permitted under the Rules, and the Defendants cite no case law to suggest that it can't be done.  We see nothing wrong with the fact that Dr. Boswell revised his figures to address the criticisms leveled against him at his deposition.

Pltfs' Resp. at 7.

Plaintiffs' reference to "the Rules" is presumably a reference to Rule 30(e), which addresses corrections to deposition testimony.  Fed.R.Civ.P. 30(e).  Rule 30(e)

does allow a deponent to make corrections to the transcript of his testimony following his deposition.  The rule states, in part, "the deponent shall have 30 days . . . in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them."  Id.

However, plaintiff is attempting to stretch the rule to allow his expert the equivalent of a second deposition, without the burden of questioning by opposing counsel.  The changes made by Boswell do not merely correct mistakes made by the reporter.  They completely alter and reverse various of his answers and opinions. In one example out of numerous, Boswell answered a question during his deposition by saying, "[w]e've got to have at least 7,500 today."  Deft's Mtn Excl., Ex. C, 42-11.  In the Amendment Sheet, Boswell states, "We've got to have at least 3,669 today and invest it at 6 percent for 11.53 years to equal the 7,184."  Id., Ex. D at 2.  As a reason for the change, plaintiffs state, "Answer based on further research and review."  Id.

The Tenth Circuit Court of Appeals has stated that "[a] deposition is not a take home examination."  Garcia v. Pueblo Country Club, 299 F.3d 1233, 1242 (10th Cir. 2002).

> "The purpose of Rule 30(e) is obvious.  Should the reporter make a substantive error, i.e., he reported 'yes' but I said 'no,' or a formal error, i.e., he reported the name to be 'Lawrence Smith' but the proper name is 'Laurence Smith,' then corrections by the deponent would be in order.  The Rule cannot be interpreted to allow one to alter what was said under oath.  If that were the case, one could merely

5

answer the questions with no thought at all, then return
home and plan artful responses."

Id., n. 5, *quoting* Greenway v. International Paper Co., 144 F.R.D. 322, 325 (W.D.La.

1992) (holding that Rule 30(e) may not be used to alter what has been said under

oath);*see also, e.g.,* Coleman v. Southern Pac. Transp. Co., 997 F.Supp. 1197, 1205

(D.Ariz. 1998) (a change in a deposition statement does not eradicate the deponent's

original answers); S.E.C. v. Parkersburg Wireless, L.L.C., 156 F.R.D. 529, 535 (D.D.C.

1994) (noting modern trend in which courts do not allow a party "to make any

substantive change she so desires" in deposition testimony); Rios v. Bigler, 847

F.Supp. 1538, 1546-47 (D.Kan. 1994) (stating that the court will consider only those

changes that clarify the deposition, and not those which materially alter it).

In Barlow v. Esselte Pendaflex Corp., 111 F.R.D. 404, 406 (M.D.N.C. 1986), the

court refused to consider a plaintiff's changes to her deposition because of the sheer

number of changes that she sought.  The court also noted that a large number of

changes places an inappropriate burden upon the court reporter who is responsible

for correcting any alleged errors in the transcript.  The reasoning in this case

illustrates the error of plaintiff's arguments.  That is, Rule 30(e) provides a vehicle for

litigants to correct what was reported in the transcript, not to create an entirely new

transcript.

The changes to the deposition that are attempted by plaintiffs' expert fall within

the abuses that are discussed in Garcia and the other cases.  The changes are a

patent effort to completely alter the responses that were made under oath, and an effort to provide additional testimony that is not subject to questioning by opposing counsel.  For those reasons, I decline to consider any of the answers that are provided in plaintiff's Amendment Sheet, and I will ignore them the same as if the errata sheet was stricken.

**Boswell's "Revised" opinions.**  Boswell's "revised opinions," dated November 30, 2004, and January 27, 2005, appear to be simply more of the same type of "correction" that Boswell attempted in his errata sheet.  Plaintiffs nowhere state that the revised opinions are being offered pursuant to Rule 26(e).

Rule 26(a)(2)(B) states that expert witnesses must provide the court and opposing counsel with a written report that contains, among other things, "a complete statement of all opinions to be expressed and the bases and reasons therefore; the data or other information considered by the witness in forming the opinions; [and] any exhibits to be used as a summary of or support for the opinions." Fed.R.Civ.P. 26(a)(2)(B).  In the circumstances of this case, counsel were directed to designate their experts and provide expert reports in accordance with the deadlines set in the scheduling order, or in accordance with any extensions that were granted, which would be the same circumstances for expert deadlines for every case that is filed in this district.  Fed.R.Civ.P. 26(a)(2)(C).

The purpose of Rule 26(a)(2)(C) is to prevent unfair surprise at trial and to permit the opposing party to prepare rebuttal expert reports, to depose the expert in

advance of trial, and to prepare for depositions and cross-examination at trial. *See*

Coles v. Perry, 217 F.R.D. 1, 4 (D.D.C. 2003) (noting that "the very purpose of the rule

is nullified" when an expert "supplements" his report by addressing a new matter after

discovery has ended). The Rule also prevents experts from "lying in wait" to express

new opinions at the last minute, thereby denying the opposing party the opportunity to

depose the expert on the new information or closely examine the expert's new

testimony. *See* Keener v. United States, 181 F.R.D. 639, 641 (D.Mont. 1998).

    In light of the purposes of Rule 26(a), Rule 37(c)(1) provides for the exclusion

at trial of any information not disclosed pursuant to Rule 26(a), unless the failure to

disclose is harmless, or if there was substantial justification for such failure.

Fed.R.Civ.P. 37(c)(1). Plaintiffs have not articulated any facts that would bring

Boswell's "revisions" within either of the exceptions to Rule 37(c)(1). Discovery began

well over a year ago, and the deadlines for discovery and designation have long since

passed. The next date in this matter is Judge Nottingham's final pretrial and trial

preparation conference, and that date is October 14, 2005. No time remains for

defendants to depose Boswell on the amendments and revisions to his conclusions.

    Rule 26(e)(1) provides a limited exception to the deadlines that are provided in

Rule 26(a)(2)(C), or, as in this case, the deadlines that are set by the scheduling

orders. The rule requires that an expert witness supplement his report if he "learns

that in some material respect the information disclosed is incomplete or incorrect and

if the additional or corrective information has not been made known to the other

parties during the discovery process or in writing." Fed.R.Civ.P. 26(e)(1).  The rule

does not permit parties to file supplemental reports whenever they believe such

reports would be desirable, or necessary to their case.  Instead, the Rule permits

supplemental reports only for the narrow purpose of correcting inaccuracies or

adding information that was not available at the time of the initial report.  Keener v.

United States, 181, F.R.D. at 640.  Specifically, supplemental reports are permitted

under Rule 26(e)(1) only (a) upon court order; (b) when the party learns that the earlier

information is inaccurate or incomplete; or (c) when answers to discovery requests

are inaccurate or incomplete.  Id.

Plaintiffs have not expressed or delineated the purpose for Boswell's revisions

to his opinions.  If plaintiffs are seeking to "supplement" Boswell's testimony or report

pursuant to Rule 26(e)(1), neither they nor Boswell ever stated what new information

was received that prompted Boswell to make the supplementation.  If plaintiffs are

seeking to "correct" either his deposition testimony or his report, Rule 26(e)(1) states

that such corrections are proper only when the testimony or report "is incomplete or

incorrect."  If this is plaintiffs' intent, Boswell does not state, or does not state with

particularity, what error he made, where the error appears in his testimony or report,

the reason that he made the error, and the nature of the correction that he is making

in his revised reports.  At best, as asserted by counsel for defendants, all of the

changes being made by Boswell appear to be little more than his morning-after

efforts to answer the deposition questions of defense counsel better than he did

during the deposition.  For these reasons, I will disregard Boswell's revised opinions,

the same as if the revised opinions were stricken.

**2**

In summary, opposing counsel and the court are not obligated to pick through

an array of errata sheets or "revised opinions" that contain answers that contradict or

expand upon an expert report or deposition testimony in order to determine what the

deponent's "true" answer is, and on what basis.  An expert report is not a trial balloon,

and a deposition is not a dry run or training session.  Thus, for purposes of

determining defendant's Motion to Exclude Boswell as an expert, I rely exclusively

upon Boswell's expert report and his deposition testimony.

### <u>DAUBERT</u> AND <u>KUMHO</u> TESTS

**1**

Defendants challenge the scientific bases or methodologies which were

utilized by Boswell.  They argue that under the tests which are established in the

<u>Daubert</u> and <u>Kumho</u> cases Boswell should be stricken as a witness.  <u>Daubert v.</u>

<u>Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993); <u>Kumho Tire Co. v.</u>

<u>Carmichael</u>, 526 U.S. 137, 119 S.Ct. 1167 (1999).

Plaintiffs argue, first, that <u>Daubert</u> does not apply to this case because, unlike

the <u>Daubert</u> case, this case does not involve a question of causation.  Pltfs' Resp. at

2-4.  They argue, second, that the <u>Daubert</u> line of cases does not apply to expert

opinions in the area of economics.  <u>Id</u>. at 3.  Third, they argue that defendants may not

dispute the reliability of Boswell's opinions unless defendants themselves present counter-opinions from their own expert.  <u>Id</u>.  Fourth, plaintiffs argue that an economist such as Boswell "merely calculates, using logical and accepted arithmetic formulas. . . ." Pltf's Resp. at 3.  Finally, they assert that the methodologies and opinions contained in Boswell's initial report and deposition testimony satisfy any tests for reliability or admissibility under the rules –  apparently meaning to refer to Rules 104 and 702 of the Federal Rules of Evidence.

I need not address plaintiff's first four arguments, except briefly.  Counsel for plaintiff apparently is unfamiliar with <u>Daubert</u>, and with the line of cases that have emerged since <u>Daubert</u> was decided.  To the extent that plaintiffs' first three arguments challenge the applicability of the <u>Daubert</u> principles to the expert testimony that is at issue here, I decline to address those arguments except to the extent that I describe <u>Daubert</u> and <u>Kumho</u> briefly below.

To the extent that plaintiffs assert in their fourth argument that Boswell, as an economist, "merely calculates" using "accepted arithmetic formulas," plaintiffs must recognize that expert testimony is unnecessary for such limited purposes.  Rule 702 has three major requirements: (1) the proffered witness must be an expert; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact.  *See* <u>Paoli R.R. Yard PCB Litig.</u>, 35 F.3d 717, 741-42 (3rd Cir. 1994).  Jurors can add and subtract, and if Boswell's sole function is to perform this role, plaintiffs do not need an expert.

However, the court is required by <u>Daubert</u> itself to address defendants'

challenge to the reliability of Boswell's opinions.  I do that below.

**2**

In <u>Daubert</u>, the United States Supreme Court held that trial courts must engage

in a "gatekeeping" role with regard to the introduction of expert testimony.  <u>Daubert</u>,

509 U.S. at 592-97.  In considering scientific or expert testimony, the courts are

concerned, in part, with the application of Rules 104 and 702 of the Federal Rules of

Evidence.

> Faced with a proffer of expert scientific testimony, then, the
> trial judge must determine at the outset, pursuant to Rule
> 104(a), whether the expert is proposing to testify to (1)
> scientific knowledge that (2) will assist the trier of fact to
> understand or determine a fact in issue.  This entails a
> preliminary assessment of whether the reasoning or
> methodology underlying the testimony is scientifically valid
> and of whether that reasoning or methodology properly can
> be applied to the facts in issue.

Id. at 592.  Once the court is aware that scientific evidence is at issue, judges are

obligated to ensure that "any and all scientific testimony or evidence admitted is not

only relevant, but reliable."  <u>Id</u>. at 589.  The Court stated, "Rule 702 . . . clearly

contemplates some degree of regulation of the subjects and theories about which an

expert may testify."  <u>Id</u>.

To carry out their role as gatekeeper, trial courts must weigh and evaluate the

admissibility of expert testimony according to several factors, including the following:

(1) whether the theory or technique at issue has been subjected to testing, (2)

12

whether the theory or technique has been subjected to publication and peer review,

(3) whether the theory or technique has a known or potential rate of error, and (4)

whether the theory or technique has achieved general acceptance in the particular

technical or scientific community. Id. at 593-94. The Supreme Court has emphasized

that "the test of reliability is 'flexible,'" and that the list of specific factors contained in

Daubert "neither necessarily nor exclusively applies to all experts or in every case."

Kumho, 526 U.S. at 141, 119 S.Ct. at 1171.

> Rather, the law grants a district court the same broad
> latitude when it decides how to determine reliability as it
> enjoys in respect to its ultimate reliability determination.

Id. at 142.

In the Kumho case, the Supreme Court was asked to decide whether the

gatekeeping role of a trial judge is limited to an evaluation of "scientific testimony"

only, or whether the same role should be performed with regard to all expert

testimony. The Supreme Court held that the language of Rule 702 "makes no

relevant distinction between 'scientific' knowledge and 'technical' or 'other

specialized' knowledge." Id. at 1174. Thus, Daubert's general principles apply to all

expert matters which fall within the ambit of Rule 702. Id. at 1175. Regardless of the

scientific or technical field from which an expert springs, the objective of the

gatekeeping requirement is "to make certain that an expert, whether basing testimony

upon professional studies or personal experience, employs in the courtroom the

same level of intellectual rigor that characterizes the practice of an expert in the

relevant field." Id. at 1176.  The focus of the court's inquiry must be "solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 594.

## CHALLENGES TO BOSWELL'S METHODOLOGIES

### 1. Calculation of present value.

One of the primary elements of damage for which plaintiffs seek recovery is future wage loss.  Plaintiffs assert that as a result of their wrongful termination from employment by defendants, they have been compelled to accept employment at lesser pay and/or with decreased benefits.

Defendants challenge Boswell's methodology for computing plaintiff's future wage losses.  They note that Boswell calculated the present value of future losses by multiplying plaintiffs' claimed current annual loss amounts by the number of future years of earnings they expect to experience.  Defendants argue that Boswell's methodology for computing plaintiffs future wage losses is improper because in reducing their claims to present value he failed to consider either the growth rate (inflation) or the discount rate (interest). See Defts' Mtn Excl. at 7, and Ex. A at 4-5. Boswell states in his report:

> For the purpose of this appraisal of economic loss, future losses are adjusted upward at the same rate as the discount rate used to derive present values of the future losses.  Therefore, the rates cancel each other.  This methodology is known as the "net offset method."

Id., Ex. A at 5.  Defendants point out that Colorado courts have explicitly rejected

14

Boswell's version of the "net offset method."  *See* McDonald's Corp. v. Brentwood Center, Ltd., 942 P.2d 1308, 1311 (Colo.App. 1997); Brady v. Burlington Northern Railroad Co., 752 P.2d 592, 594 (Colo.App. 1988).

In the Brady case, the Colorado Court of Appeals determined that an award for future monetary damages "must be adjusted to present value," and a jury must "receive evidence and appropriate mathematical guidance on the method of adjusting future losses to present worth." Brady at 594.  The Court held that the fairest award of damages for future losses is that which takes into account both discount and inflation rates.  "This computation allows the plaintiff to be made whole without receiving a windfall." Id.

The Court of Appeals stated that the inflation and discount rates must be demonstrated with competent evidence, and once either or both of these rates are established, the trial court may consider one of two "approved approaches" to the mathematical calculation.

> First, the "inflation-reduction" or "independent incorporation" method requires increasing the entire lump sum award by the compounded rate of inflation and then applying the discount rate to reduce the inflated sum.
>
> The second method, the "offset" method, requires that the inflation rate be subtracted from the discount rate, to achieve the "real" interest rate, which is then applied to the lump sum, with the result being added to or subtracted from the original lump sum.

Id. (internal citations omitted).

15

Finally, the Court acknowledged the existence of a third method, apparently the one adopted by Boswell.  This method uses "a set formula which assumes a constant relationship between the two rates."  Id.  The Court stated:

> However, there is no logical basis for assuming that the discount rate and the inflation rate will net to zero.  Therefore, we reject that approach, although recognizing that in a particular case the two rates could offset each other.

Id. (internal citation omitted); see also McDonald's, 942 P.2d at 1311 (holding that in a non-jury trial the trial judge must make explicit findings regarding the appropriate discount and inflation rates).

These cases appear to make clear at least two propositions.  First, the party who seeks to establish the present value of a claim for future loss must present "competent evidence" of the rates for discount and inflation.  Brady at 594.  Second, no party may assume that the discount and inflation rates negate one another.  Rather, competent evidence as to each of the rates must be presented, and only if the rates, in fact, negate one another may the jury be allowed to consider any methodology in the nature of a "net offset method."  Id.

Plaintiffs argue that they "do not agree with this analysis."  Pltfs' Resp. at 5.  They quote from the Brady opinion (although without providing a citation to that opinion), where the court of Appeals stated:

> If neither party provides competent evidence of either the inflation rate or the discount rate, a lump sum award not adjusted for present value is appropriate.  If competent

16

> evidence of the discount rate is presented but there is a
> failure of proof as to the inflation rate, the award must be
> reduced to present value with no adjustment for inflation.
> Similarly, if there is competent evidence as to the inflation
> factor but a failure of proof as to the discount rate, the lump
> sum must be adjusted only for inflation.  Last, if competent
> evidence of both the discount and inflation rate is
> presented, the fact finder must consider both in computing
> the award.

Brady, 752 P.2d at 594 (internal citations omitted); and see Pltfs' Resp. at 5.

Plaintiffs are correct in their assessment of the legal principles that will govern

Judge Nottingham in his weighing of the instructions of law to be given to the jury,

depending upon the state of the evidence at the conclusion of the trial.  But the motion

before me at this time is one to exclude the opinion of plaintiffs' expert, because he

failed to obtain and utilize any evidence at all with regard to the discount and inflation

rates.  Instead, he merely assumed, without any evidence, that they would offset one

another.  The Court of Appeals stated unequivocally that such a method for computing

present value is unacceptable and improper.

Plaintiffs argue that if defendants wish, they can present their own "evidence of

discount rates and inflation rates, and show that they would change the result. . . ."

Pltfs' Resp. at 6.  Or, according to plaintiffs, "[i]n the alternative, Dr. Boswell can plug in

[defendants'] figures in a revised report, [but] in no case should these facts support a

disqualification of a witness."  Id.

At this point, the test is not whether Boswell should be disqualified, but whether

he should be permitted to offer an opinion with regard to the present value of plaintiffs'

17

future losses.  Neither his expert report nor the testimony he provided during his deposition provide any basis for him to be allowed to do so.  Boswell failed to provide any competent evidence of either the discount or the inflation rate, and he used a legally improper methodology for calculating plaintiffs' future losses.  Therefore, I will grant defendants' motion to prohibit Boswell from offering an opinion in regard to plaintiffs' future losses.

As plaintiffs have observed in their Response, and as pointed out by the Colorado Court of Appeals in Brady, "a lump sum award not adjusted for present value" may be the means by which they jury will determine any future losses that may be suffered by plaintiffs.  Brady at 594.  However, the calculation of such an award is little more than a mathematical computation, and no expert is required for such a purpose.

### 2. Loss of interest on Schmidt's retirement fund withdrawal.

Plaintiff Larry Schmidt claims that he withdrew $7,500 from his retirement fund with Fremont County for living expenses after he was terminated from his employment.  As part of his damages, Schmidt claims that he has lost interest on the $7,500.  Boswell projected an interest rate of 6 percent for determining Schmidt's losses as a result of his premature withdrawal of the $7,500, and computed the losses of interest to be $7,184.  See Defts' Mtn Excl. at 12, and refs. to depo testimony cited there.

When asked, Boswell could provide no source or rationale for his use of 6

18

percent as the appropriate interest rate to use.  Boswell testified that the basis for that rate was "not in my file.  It's in my head."  Id., Ex. C, p. 45, ll 1-17.  Defendants argue that Boswell's use of 6 percent as the appropriate rate to assess is "no more than rank speculation."  Id. at 12.

Defendants also argue that any losses Schmidt may suffer as a result of his withdrawal of these funds is a projection of a loss in future dollars.  In defendants' view, Boswell cannot accurately project the amount of these losses unless he applies a discount rate to reduce Schmidt's losses to present value.  Id.

Plaintiffs argue that defendants "make a highly technical argument concerning the discounting of future dollars to present value."  Pltfs' Resp. at 6.  In plaintiffs' view:

> This argument is best left to the finder of fact for
> adjustments but in no way relates to Dr. Boswell's ability to
> testify.  We submit that this represents a present loss
> because the plaintiff is losing interest in this money and
> any use to which it may be put.

Id.

Plaintiffs' argument that Schmidt's loss is a "present loss," and therefore need not be reduced to present value, is simply not correct.  Boswell himself was attempting to calculate the *projected* loss that Schmidt would suffer over a period of approximately 11 years as a result of the premature withdrawal of the funds.  Losses that do not accrue until a date in the future, including such losses as wages, are future losses, and under Colorado law must be reduced to present value.

Plaintiff's argument that Schmidt's loss is a present loss because he is

"losing interest in this money *and any use to which it may be put*" simply misses the point of retirement funds.  Under the tax laws that govern the use of retirement funds, Schmidt could not "use" any of his retirement funds (except in very particular exceptions) without penalty until age 59½ .  Plaintiffs may be correct in their argument that plaintiff was caused to suffer a tax penalty as a result of the premature withdrawal of the funds, and assuming that plaintiffs present competent evidence at trial as to the amount of the penalty that Schmidt suffered, the jury can do a computation of his loss.  However, no expert is required or necessary for such a purpose.

The question for me to resolve is whether Boswell should be allowed to testify that Schmidt will lose $7,184, or any amount, as a result of his premature withdrawal of a portion of his retirement funds.  First, Boswell provided no data with regard to his selection of 6 percent as the rate to be applied in calculating Schmidt's loss over time, and I fail to understand why Boswell selected an interest rate apparently out of thin air.  For example, Boswell could have looked to the past performance of Boswell's retirement fund for an appropriate rate of gain over a certain number of years.  That would provide, at the very least, a data base upon which justified projections could be made in regard to future losses.  Whatever his reasons, Boswell failed to  provide *any* justification for his selection of 6 percent as a rate of gain.

Second, Boswell also failed to reduce Schmidt's future losses to present value.  Thus, he failed to follow either of the methods that the Colorado Court of Appeals has determined are the proper means by which to calculate the value of a

party's future loss, that is, the "inflation-reduction" method, or the "offset" method.
Brady, 752 P.2d at 594.

In summary, in attempting to calculate Schmidt's losses as a result of his premature withdrawal of retirement funds, Boswell has failed to provide any justification for his use of 6 percent as the multiple for future losses, and has failed to utilize a proper methodology under Colorado law.  For these reasons, I will grant defendants' motion to prohibit Boswell from offering an opinion on Schmidt's alleged loss of interest.

### 3. Foraker's future wage losses.\

The data and calculations that are contained in Boswell's report and deposition testimony in regard to Foraker's claimed future wage losses are very difficult to understand.  In reaching conclusions about Foraker's future wage losses, Boswell appears to have relied upon a limited sample of wage growth for Foraker in her employment with the County, used a number for percentage increase in wages (i.e., 7 percent) that had no basis in any evidence or any standards that were acceptable in Boswell's profession, and in making calculations for wage growth ignored the data that he himself provided.  In comparing and calculating the difference in wage growth between Foraker's employment with the County and her subsequent employment with Re/Max, Boswell used percentage increases in wages that had no basis in any known evidence, and ignored a percentage increase in Foraker's wages at Re/Max that *did* have a basis in the known evidence.

Foraker was terminated from her employment with Fremont County approximately two-thirds of the way through 2002.  At the time that she was terminated, her W-2 reflected that she had earned $14,367.  Based upon those earnings, Boswell calculated that Foraker would have earned an additional $7,684 through the end of 2002 for total earnings in 2002 of $22,051.  *See* Defts' Mtn Excl., Ex. C at 58:5-7.

Boswell states that if Foraker had remained with the County, her wages there would have increased by 7 percent from 2002 to 2003.  Id. at 57, 6:12.  However, he also states that plaintiff's expected earnings with the County for 2003, had she remained employed there, would have been  $24,524.  This number, Boswell admitted, represents an increase in her wages of $2,473, which is a percentage increase of slightly over 11 percent.  Id. at 58:17-24.  The percent of increase that Boswell claimed that Foraker would enjoy, 7 percent, is in conflict with the actual increase in salary that Boswell calculates.  No explanation for the conflict is ever provided.

Boswell points to no accepted standard, no study, and no part of the evidence that had been provided to him that would justify his selection of 7 percent as the anticipated growth rate for plaintiff's earnings.  Counsel for plaintiff states in his Response that from 1991 to 2002, plaintiff had received annual "performance increases" of 2 percent, and "from time to time, the County adjusted wages for cost of living and other reasons as well."  Pltfs' Resp. at 7.  In response to questions from

22

defense counsel, Boswell stated that his figure of 7 percent was based upon "5 percent cost of living and 2 percent based on performance." Id. at 57:9. However, in reviewing Boswell's report and deposition testimony, I find no evidence that Boswell had obtained any such data from any of the information that had been provided to him. Foraker's annual wage increases before 2002 appear to have been more in the nature of increases of 3 to 4 percent. See id., Ex. A (Boswell report) at 8. If the number "7" has no basis in the evidence or any known and accepted growth rate, it cannot provide a reliable basis from which to determine projected wage losses.

Even if the figure of 7 percent was supported by some rational basis, Boswell himself ignored this figure, and calculated Foraker's future wage losses using some different, and unexplained basis. Using the figure of 7 percent, Foraker's annual wages would not grow from $22,051 to $24,524 between 2002 and 2003. Boswell is unable to explain the discrepancy between his selection of 7 percent as the multiple for Foraker's earnings growth, and an increase in salary of $2,473. Id., Ex. C at 60:69-61. He states at one point that the difference springs, in part, from the fact that he was not using $22,051 as the base number for plaintiff's earnings in 2002, but was using instead $23,051. However, Boswell never states why he did not use the numbers that he himself provided for Foraker's earnings ($14,367 for part of 2002, and a projection of $7,684 for the remainder of the year, for a total of $22,051), and uses instead the number $23,051. Boswell pointed to nothing in the evidence, or even in his own computations, to support his use of the latter figure as the amount Foraker would

have earned in 2002.

I would stress that I am unconcerned with the outcome of the numbers that are reached in any of the calculations or computations. Defendants have challenged the methodology employed by Boswell in charting Foraker's percentage increase in wages over time, and, in response to the challenge, Boswell has provided no rational explanation for his selection of certain numbers, such as 7 percent as his multiple for income growth, no rational explanation for an earnings growth of 11 percent instead of 7 percent between 2002 and 2003, and no explanation at all for his use of an earnings figure for 2002 that was $1,000 higher than the total of the numbers that he himself had provided as Foraker's earnings for 2002.

In projecting the difference in earnings between what Foraker would earn at Re/Max, as opposed to what she would have earned at the County, Boswell testified that she would suffer an income differential of $2,000 per year. *See*, id., Ex. C at 61:16 to 63:11. Boswell provided no basis at all for his use of this number, and the evidence and data available to him, including data that he himself provided, suggested that the differential would be less than $2,000 per year.

For 2004, Boswell calculated Foraker's earning loss for the first eight months at $997. Id. at 61:16-22. Projecting that loss forward to annualize her losses for 2004, Boswell determined that she would suffer a difference in pay at Re/Max of $1,300. Id. 62:9-10. However, Boswell nowhere provided an explanation for why, going forward in time, Foraker would suffer a differential in pay of $2,000 per year, as

24

opposed to the $1,300 per year that he had actually calculated.  The $2,000 per year was based upon no data, and upon no calculation.

Boswell also acknowledged that Foraker's salary at Re/Max between October 15, 2002 and November 21, 2003 increased from $19,250 to $23,500, a gain of 22 percent in earnings.  Id. at 67:7-23.  Although admitting that Foraker's earnings at Re/Max had increased by 22 percent, Boswell admitted that he ignored this data in reaching his conclusion in regard to the alleged difference between Foraker's earnings at the County as opposed to her earnings at Re/Max.  However, he provided no reason or justification for this decision.  He merely determined that the figure of 22 percent was not entitled to "much weight."  Id. at 68:11-12.

Defendants also challenge Boswell's conclusions in regard to Foraker's potential for earnings at the County, because Boswell failed to "consider the possible effects of the Colorado Taxpayer Bill of Rights, commonly referred to as TABOR."  Defts' Mtn Excl. at 16.  In defendants' view, Foraker's earnings would be subject to decreases or reductions because of the possible effects of TABOR on county budgeting decisions.

Contrary to defendants' argument on this point, I do not agree that Boswell's failure to consider TABOR in determining Foraker's wages at the County undermines the reliability of Boswell's computations.  I agree that TABOR is a factor that an economist could, or even should, consider in weighing the prospects for increased wages from a public employer, but I disagree that this factor can be reduced to a

25

number or a percent that can be applied against any projected wages.  Rather,

TABOR is simply one of those factors that provide fodder for the cross-examination of

any expert who has attempted to calculate the future wages of a person who was

employed by a public agency.

In summary, Boswell's opinions in regard to Foraker's projected earnings at

the County are not supported by any data, or by any standard that is accepted by

professionals in Boswell's field.  His selection of 7 percent as a multiple for earnings'

growth is not supported by any evidence available to him, and is even undermined by

the history of earnings that he provides as a part of his report.  Boswell's opinion that

Foraker will suffer a difference in pay of $2,000 for the next 24 years is supported by

no data or evidence, and is even contradicted by Boswell's own calculations of her

losses at Re/Max, and by the data that reflects a percentage increase of earnings at

Re/Max of 22 percent over her initial earnings period.

Therefore, I conclude that Boswell's opinions in regard to Foraker's projected

income losses lack the degree of validity and reliability that is associated with

professionals in the area of economics, and he has failed to demonstrate the "same

level of intellectual rigor that characterizes the practice of an expert in the relevant

field."  Kumho at 1176.  For those reasons, I will grant defendants' motion to prohibit

Boswell from offering an opinion in regard to Foraker's projected income losses.

**4.  Differences in employers' matching contributions to retirement.**

Foraker contributed to the County retirement plan while she was employed

26

there, and contributed as well to the plan that was available to her at Re/Max. Boswell received information from Foraker that she received matching contributions from the County of 4 percent, and matching contributions from Re/Max of 3 percent, a difference of 1 percent. Nevertheless, he calculated Foraker's loss of retirement benefit the same as if she was receiving 2 percent less at Re/Max than she had received at the County, instead of 1 percent.

While being deposed, Boswell appeared to admit that he had used the wrong percentage multiple in order to calculate Foraker's losses in regard to her retirement benefits. When asked why he used 2 percent instead of 1 percent, when his notes reflected that the difference was only 1 percent, Boswell answered, "[o]ffhand, I can't think why I did that. * * * I'll have to review it, but it probably should be 1." Defts' Mtn Excl., Ex. C at 82-83.

The attorneys for both sides acknowledge that Boswell corrected his error in one of his revised opinions. However, for the reasons stated above, his revised opinions have been stricken from my consideration of Boswell's expert opinions. Thus, for whatever reason, Boswell used the wrong percentage multiple to calculate for Foraker the difference between the County's plan and the plan with Re/Max.

Boswell's calculation of Foraker's claimed loss in regard to retirement benefits lacks credibility or reliability, and, as I stated previously, an expert report is not a trial balloon, nor is a deposition a training session. Therefore, Boswell will not be permitted to offer an opinion on this matter.

27

**5. Schmidt's future wage losses.**

**(a)**

After being terminated by the County, Schmidt began working for Reynolds Construction earning $15.00 per hour.  Boswell sought to determine the future losses in wages that would be suffered by Schmidt as a result of this re-employment.  He stated in his report that his conclusions with regard to future wage losses for Schmidt were based upon a comparison of Schmidt's last earnings at the County, annualized to reflect a full year, and his first year earnings at Reynolds, again annualized to reflect a full year.  In his report, Boswell stated:

> The loss of future earnings is based mainly on the difference in annual wage levels between what he was earning at the appraisal date [September 1, 2004] and what is estimated he would have been earning with the County at the same date, absent his termination, with a difference in annual wages of about $9,764 plus additional factors related with construction, e.g., weather, time between projects, and the general uncertainty of the business comprising an additional 10% of his wage level ($2,980).  The two amounts total $12,744.  It is assumed that this difference would extend throughout his remaining worklife of 11.53 years.  Therefore, the estimated future earnings loss is calculated as $146,938 (2004 present value).

Defts' Mtn Excl., Ex. A at 4 (parentheses in original).

Defendants challenge Boswell's methodology in reducing Schmidt's hourly wage from $15.00 per hour to $14.33 per hour.  They argue that Boswell had no basis, or used an improper basis, to reduce Schmidt's hourly wage.  They point out

that this reduction may be only .67 cents per hour, but over Schmidt's projected employment life of 11.3 years the .67 cents causes a difference in outcome of over $16,000.  *See* Defts' Mtn Excl. at 18.

I agree that Boswell used an improper methodology for calculating Schmidt's future wage losses.  However, I disagree, in part, with the basis upon which defendants challenge his methodology.

The formula used by Boswell to determine Schmidt's future wage losses is meaningful and understandable.  That is, Boswell stated that he annualized Schmidt's earnings at both the County and Reynolds, and subtracted one from the other, resulting in a number that reflects the difference in annual wages between 2003 and 2004. Boswell calculated the difference in annual wages to be "about $9,764.  Id.

Beyond his rather basic formula for determining a wage differential, Boswell's numbers and computations become utterly confusing and conflicting.  Indeed, in calculating Schmidt's future wage losses, Boswell appears not to have followed the basic formula with which he allegedly began, and pursued instead some unstated methodology.

Boswell does not provide in his report the number that he determined would represent Schmidt's annualized earnings at Reynolds for 2004.  However, using the data provided by Boswell in his report, I would be compelled to conclude that Schmidt's annualized earnings at Reynolds for 2004 were $24,493.  That is the net

29

result that is reached when $12,744, the figure that Boswell determined was the difference in pay between the two employers, is subtracted from the annualized wages earned by Schmidt at the County, which were $37,237 ($37,237 - $12,744 = $24,493). However, that is not the number that Boswell actually calculates for Schmidt's annualized earnings.

Boswell testified during his deposition that he, in fact, had actually calculated Schmidt's annualized earnings at Reynolds, and the number he reached was $29,799. *See* Pltfs' Resp., Ex. 3 (Boswell depo) at 87-88; *see also* Defts' Mtn Excl., Ex. C at 85:6-11; 89:21. Thus, the number that Boswell actually calculates for Schmidt's annual earnings at Reynolds is over $5,000 greater than the number that results when you follow the formula that he provides in his report. That number, as noted, is $24,493.

To obtain the number that would reflect Schmidt's annualized earnings at Reynolds, i.e., $29,799, Boswell used the figure that represented the wages that Schmidt had actually earned between January 13 and August 31, 2004. Schmidt's pay receipts reflected that he had earned gross pay of $19,125 for that 7½ month period. Boswell then, apparently, extrapolated from Schmidt's earnings of $19,125 for the 7½ months, and reached annualized earnings of $29,799. Id. This set of computations is understandable and makes sense, as far as it goes.

Taking Schmidt's annualized earnings at the County of $37,237, and subtracting from that number his wages at Reynolds of $29,799, leads to $7,438, not

30

$9,764 as calculated by Boswell. In fact, I cannot find anywhere in Boswell's report any basis or source for the number $9,764, and Boswell has provided no explanation of the methodology that he utilized in order to obtain that number.

Boswell states in his report that he reduced Schmidt's earnings at Reynolds by 10 percent in order to reflect what he referred to as factors associated with "weather, time between projects, and the general uncertainty of the business. . . ." Id., Ex. A at 4. Boswell applied the 10 percent against Schmidt's annualized wages of $29,799 to obtain the figure $2,980, and concluded that his annualized salary should be reduced by that amount. Id. Thus, in Boswell's view, Schmidt's salary is $2,980 less than what Boswell calculated Schmidt's *actual* annualized salary to be, or $26,819 instead of $29,799. However, the figure of $26,819 appears nowhere either in Boswell's report, or in his deposition testimony.

Boswell was asked during his deposition to provide the data or source that would justify his use of 10 percent as a percentage for the alleged "downtime" for Schmidt. Boswell admitted that he did not have any data to support such a conclusion, either from Schmidt or from Reynolds. In Boswell's words, the use of 10 percent was "a subjective estimate on my part." Defs' Mtn Excl., Ex. C at 90:10.

First, an expert cannot pick numbers out of the air, with no supporting data, study or evidence of any type. Without some evidence that Reynolds' employees, including Schmidt, typically work less than 100 percent of the days that are contained in a work year, Boswell's use of his 10 percent figure is purely speculative. Counsel

31

for plaintiff defends Boswell's 10 percent reduction by stating that such a loss of days or hours of work is "a fact that is well known in the industry." Pltfs' Resp. at 10. Well known or not, plaintiffs' expert is nevertheless required to point to *some* basis for what is otherwise an unjustified assumption.

Second, even if Schmidt could be expected to have downtime of 10 percent, that 10 percent of downtime already is contained in Boswell's calculations of Schmidt's annualized earnings, and Boswell's method for the use of this 10 percent has the effect of reducing Schmidt's earnings at Reynolds by a *second* 10 percent.

As described above, Boswell calculated Schmidt's annualized earnings at Reynolds to be $29,799. He reached that number by starting with Schmidt's actual earnings from January 13 to August 31, 2004, which he found to be $19,125. Id., Ex. A at 8 (Ex. III to report). If Boswell is correct in assuming that construction workers will work 10 percent less because of factors associated with that industry, then by August of 2004 Schmidt had, in fact, worked 10 percent less than he otherwise could have worked if he were not employed in construction. In other words, assuming 10 percent fewer work days, Schmidt's pay of $19,125, is *ipso facto* ten percent shy of what he could have earned, had he worked every day. To view his earnings any other way is to conclude that between January and August he was *not* working fewer days than 100 percent.

Thus, even if Boswell's assumption about 10 percent downtime was correct, Schmidt's pay by the end of August already contained within it the reduction of 10

percent for days lost through weather and other factors.  Because Boswell used this eight months of pay to extrapolate an annualized salary for Schmidt, then his projections for the remaining four months necessarily contained the same *pro rata* reduction of 10 percent.

In summary, apart from the fact that Boswell has no justification in any data or evidence for applying *any* 10 percent reduction to Schmidt's pay for downtime, Boswell certainly can provide no rational basis for applying a *second* 10 percent reduction.  The second 10 percent reduction, standing alone, represents a total reduction of Schmidt's actual projected earnings over 11.53 years of $34,359 (11.53 x $2,980 = $34,359).

Boswell has provided no evidence that he followed his own methodology in attempting to determine Schmidt's future wage losses.  If Boswell subtracted the number that he determined to be Schmidt's salary at Reynolds, $29,799, from what he determined to be Schmidt's salary at the County, $37,237, he should have reached a net salary differential of $7,438 ($37,237 - $29,799 = $7,438).  Instead, he obtained a number that appears to have no justification, $9,764.  Boswell then added this latter number to the 10 percent reduction that he created, $2,980, and reached a total salary differential of $12,744.  Over a period of 11.53 years, Boswell's number results in lost future wages of $146,938 (11.53 x $12,744 = $146,938).  Using the figure of $7,438 as the actual difference in annualized salary for Schmidt, he would have future wage losses of $85,709.  Boswell has not justified his number for future wage losses by

33

any methodology, or by any references to the data that had been provided to him.

**(b)**

Defendants assert that Boswell calculated Schmidt's 2004 earnings at Reynolds based on a wage of only $14.33 per hour, as opposed to the $15.00 per hour wage at which Schmidt had been hired. They reach this conclusion by assuming that a work year is 2,080 hours, and by pointing out that 2,080 hours divided into Schmidt's annual earnings of $29,799 yields $14.33 per hour. They argue that this conclusion by Boswell means that he has effectively understated Schmidt's earnings by $.67 per hour. In defendants' view, $.67 per hour may not seem like much, but when projected over Schmidt's employment life of 11.53 years, it totals approximately $16,000. Defendants argue that Boswell has understated Schmidt's earnings in this regard by at least $16,000. Defts' Mtn Excl. at 18; *see also* Boswell depo., Pltfs' Resp., Ex. 3 at 88. They argue that Boswell has provided no explanation for this error. Id.

I agree that Boswell's decision to divide Schmidt's annualized earnings at Reynolds by the total number of hours worked in a normal, full employment year to reach an effective hourly salary for Schmidt is a methodology that cannot be justified. First, Schmidt's hourly wage is undisputed, and it is $15,00 per hour, not $14.33. Second, Schmidt's so-called effective hourly wage cannot be determined by dividing his actual annualized earnings of $29,799 by the number of hours in a normal work year. If Schmidt were a salaried employee, as opposed to an hourly employee, such

a calculation would yield an effective hourly wage.  But Schmidt is admittedly not a salaried employee, so the calculation is completely meaningless.

**(c)**

In summary, Boswell has failed to demonstrate an appropriate methodology, or that he followed an appropriate methodology, for the calculation of Schmidt's future wage losses.  For these reasons, I will grant defendants' motion to prohibit Boswell from offering an opinion with regard to any alleged future wage losses that may be suffered by Schmidt.

**6. Loss of fringe benefits.**

Boswell states in his report that Foraker and Schmidt both suffered past and future losses of fringe benefits as a result of their terminations from employment with the County, and re-employment with employers who offered less valuable, or no, fringe benefits.  In his report, Boswell does not name these fringe benefits, but states that they are the "specific items[] as set out on page 58 in the County's "Personnel Policies & Procedures."" Defts' Mtn Excl., Ex. A at 5.  In his deposition, he agrees with counsel's summary of those benefits as holidays, vacation and sick leave.  Id., Ex. C at 92:20-23.

Boswell added the benefits with regard to each plaintiff, and reached a number that represented the amount that each plaintiff lost in past fringe benefits, that is, from the date of termination to the date of Boswell's appraisal, which was September 1, 2004.  For Foraker, that number is $13,578, and for Schmidt it is $23,782.  Boswell

then did a calculation to determine the amount that each would lose over the years of their projected employment life.  For Foraker, that number is $127,507, and for Schmidt it is $106,480.

Defendants argue that Boswell has utilized an improper methodology for his calculation of plaintiffs' losses in regard to fringe benefits.  In their view, Boswell counted plaintiffs' fringe benefits twice.  They point out that Boswell admits that the amounts attributable to fringe benefits are contained within plaintiffs' respective salaries.  Id. at 94:2-7.  In their view, that is counting the fringe benefits once.  They argue that Boswell's addition of these benefits to plaintiffs' wage losses is a second counting of the amounts represented by the fringe benefits.

First, Boswell did not provide in his report or in his deposition testimony any evidence of the computations that he made in reaching the various numbers that he projects in regard to plaintiffs' alleged losses of the economic value of fringe benefits.  He has not provided the values that he attributes to each of the benefits, and the manner in which they can be carried forward over time as losses.  His methodology for reaching his numbers remains a mystery.

For example, many employers limit the number of days or hours of vacation or sick days that an employee may "bank," and require employees to use a certain number of days per year or lose them.  Boswell does not explain how an employee can both take all, or a part, of his or her vacation days, but expect to be compensated for them again after having "used the value of those days," as it were.  Additionally,

36

upon an employee's termination from employment, many employers will pay to the employee – in addition to the final pay check – the value of a certain number of vacation or sick days.  Boswell does not provide any data that would reflect whether this occurred in regard to plaintiffs when they were terminated from employment with the County.  In other words, Boswell's numbers for the losses of back fringe benefits does not provide an accounting for any additional compensation that may have been provided, or not provided, to plaintiffs in their final statements of earnings.  Boswell appears to be of the opinion that the values of the fringe benefits for plaintiffs remains the same, whether they have used their benefits or not, and whether they have been previously compensated for them or not, but he has failed to provide any explanation of the methodology that he utilized in order to reach such conclusions.

Second, I agree with the arguments of defense counsel.  Boswell has failed to provide a methodology that would demonstrate the validity of his conclusion that the value of the fringe benefits to plaintiffs was "an economic benefit" that can be *added* to their salaries.  Id. at 95:8.  Boswell states that plaintiffs had an "economic benefit" through their abilities to take off work on holidays, yet be paid for those holidays.  Id. at 95-96.

Counsel for plaintiff attempts to explain this problem by arguing that defendants"fail to understand that a person who is on vacation can secure other employment during that time to supplement his income.  Indeed, many people do just that in our society, and benefit with a 'double income' during vacation time."  Counsel

provided no data to support this conclusion, and in the absence of any data his statement is nothing more than conclusory speculation on his part.

In summary, in calculating plaintiffs' alleged losses in regard to fringe benefits, Boswell failed to provide explanations of his methodologies, failed to provide the data that he utilized in making his computations, and failed to provide a depiction or explanation of the computations that would lend support to his conclusions. For that reason, I will grant defendants' motion to exclude Boswell's opinions in regard to plaintiffs' alleged losses in regard to fringe benefits.

### 7. Proper rate of pay for Schmidt's lost paid time off.

While Schmidt was employed by the County, he continued to earn his salary for holidays, even though he did not work. At Reynolds Construction, Schmidt earned no pay for the holidays that he did not work, such as the 4th of July. As a result of this difference in compensation schemes, Boswell attempted to determine the amount of the loss that was suffered by Schmidt because he was no longer paid for certain holidays or days off.

Boswell determined that Schmidt's effective hourly rate while he was working at the County was $19.02 per hour. He reached this number by dividing Schmidt's annual salary of $37,237 by 2,080, the normal number of work hours in a year. After determining that Schmidt's rate of pay at the County was $19.02 per hour, Boswell concluded that Schmidt's loss at Reynolds Construction for holidays that he did not work, and for which he was not paid, was $19.02 per hour. *See generally*, Defts' Mtn

Excl., Ex. C at 99-100.

Defendants challenged Boswell's methodology and conclusion. In their view, "[t]here is no justification whatever for using more than $15.00 per hour, Mr. Schmidt's hourly rate at Reynolds Construction." Id. at 21. They argued that Schmidt's compensation for paid holidays was already contained within his annualized salary with the County. Thus, they assert, when Boswell deducts the equivalent of a day's pay at the rate he made as a County employee, Boswell has, in effect, duplicated Schmidt's loss in earnings for the difference in pay between $19.02 and $15.00 per hour, which is approximately $4.00 an hour, for the uncompensated days that Boswell counted. Defendants argue that Schmidt earned $15.00 per hour working at Reynolds. Therefore, his losses for uncompensated holidays should be calculated at $15.00 per hour.

Neither Boswell nor defendants have provided explanations that adequately explain to me why one methodology or the other yields the more accurate determination of loss in these circumstances. However, plaintiffs have the burden to demonstrate the reliability of Boswell's opinions, and I, therefore, conclude that they have failed to meet their burden in regard to this issue.

Additionally, Boswell appeared to have contradicted his own opinion in response to questioning from defense counsel, and his contradictions undermine the reliability of his opinion. During his deposition, the following two discussions occurred:

Q      Okay.  Let's assume that [Schmidt] takes the 4th of

July off in his current job.  How much is he out?

A      He's out the – whatever his wage rate is for those

eight hours.

Q      $15 an hour; is that not right?

A      Right.

Id., Ex. C at 98:18-24.

And at another point in the deposition, Boswell testified as follows:

A      The County, he would get the holiday. * * *  He would

get the holiday and be paid for it at the $19.02 rate.  With

Reynolds, he takes a holiday and he gets nothing.

Q      And that nothing represents how much an hour?

A      $15 an hour.

These remarks by Boswell seem to indicate that Schmidt's losses, if any, for

uncompensated holidays and other days, after commencing employment with

Reynolds, should be measured by the rate of pay that he received from Reynolds, and

not the County.  If that is the meaning of Boswell's remarks, it appears to contradict

Boswell's theme, that the losses should be measured in accordance with the rate of

pay that Schmidt received at the County.

In summary, plaintiffs have failed to demonstrate the reliability of the theory of

damages upon which Boswell relies in regard to uncompensated days off, and

40

Boswell's remarks during his deposition appear to reflect his own uncertainty with his theory. For these reasons, I will grant defendants' motion to prohibit Boswell from offering an opinion that Schmidt's losses for uncompensated days off should be calculated through reference to Schmidt's salary at the County.

### SUMMARY OF RULING

Whether my rulings address all of the opinions that have been offered by Boswell is not clear to me. However, in light of the fact that I have determined that Boswell's opinions are unreliable in regard to the major points that are addressed by him, I conclude that his opinions, taken as a whole, do not meet the standards for reliability that are described in <u>Daubert</u> and <u>Kumho</u>. Therefore, I will grant defendants' motion to exclude the testimony of Boswell from trial.

I hasten to add that I blame Boswell less for his errors than I blame counsel for plaintiffs. The errors presented in Boswell's report are the type of errors that counsel could have, and should have, caught and discussed with Boswell before the report ever was provided to counsel for defendants. For example, I do not fault Boswell for failing to know that in determining future losses the Colorado appellate courts require an expert to reach an explicit determination of the inflation and discount rates. Rather, this is an error that should have been captured and corrected by counsel. Similarly, the failed effort to "correct" Boswell's deposition testimony through the use of an "Amendment Sheet" or "Revised Opinions" is an effort that counsel should have known would be fruitless. The same may be stated with regard to Boswell's hunch

that a construction worker has downtime equal to 10 percent of the total possible hours that may be worked.  Counsel for plaintiffs could have, and should have, corrected that speculation by Boswell either by eliminating it, or by conducting an investigation to obtain data to support it.

### PLAINTIFFS' "MOTION TO AMEND PRELIMINARY PRETRIAL ORDER
### AND TO NAME AN ADDITIONAL EXPERT WITNESS"

On August 17, 2005, plaintiffs filed a motion in which they asked the court to amend the preliminary pretrial order and to name an additional expert witness to testify with regard to damages, namely, Jerome C. Darnell.  Plaintiffs state in their motion, "[i]n view of the fact that defendants have challenged the qualifications, competence and conclusion of this expert, the Plaintiffs have retained another expert to do a similar analysis of the past and future wage losses of the Plaintiffs."  Pltfs' Mtn Am. at 2.  Plaintiffs state that they wish to use the second expert either "to substantiate the conclusions of Dr. Boswell which have been challenged or to use him as a replacement for the originally named expert."  Id.

I find that plaintiffs have not sought to add Darnell as an expert in timely fashion.  For that reason, I will deny their motion.

Plaintiffs' Motion to Amend reflects an awareness on their part that the challenges leveled at Boswell's opinions by defendants had sufficient merit to them to cause plaintiffs to be concerned about the potential that defendants' motion to exclude Boswell as an expert would be granted.  As a result of this concern, plaintiffs

seek through their motion to provide a means whereby, regardless of the outcome of defendants' motion to exclude Boswell, they will have an expert on damages – if not Boswell, then Darnell.

Defendants' Motion to Exclude was filed on March 1, 2005. The evidence and arguments in regard to Boswell were available to plaintiffs at that time. If plaintiffs were nervous about the outcome of defendants' motion, the time to act upon that concern was shortly after the filing of the motion. Instead, plaintiffs waited almost 6 months before filing their motion to name an expert to serve in lieu of Boswell if defendants' motion was granted.

At this stage, the preliminary pretrial order has been completed, and Judge Nottingham is now set for his final trial preparation conference on October 14. At that conference, he frequently sets his cases for trial in a very expeditious manner, and at a relatively early date. If plaintiffs' motion was granted, an entirely new round of discovery would be necessary, including, at the very least, the potential need for defendants to designate a rebuttal expert, a new round of depositions, and, very possibly, another set of <u>Daubert</u> motions, with the attendant needs for hearings and/or rulings. These activities could have the effect of extending this case at least for another six months or more. Had plaintiffs filed their motion in timely fashion, including a timely designation of Darnell as their new expert, the need to re-open discovery and extend this case by six months could have been avoided.

I am aware that the striking of an expert because of an untimely designation is

a drastic action.  <u>Summers v. Missouri Pacific Railroad System</u>, 132

F.3d 599, 604 (10th Cir. 1997).   Before taking such an action, the

Tenth Circuit has directed trial judges to consider four factors:

> (1) the prejudice or surprise in fact of the party
> against whom the excluded witnesses would
> have testified, (2) the ability of that party to
> cure the prejudice, (3) the extent to which
> waiver of the rule against calling unlisted
> witnesses would disrupt orderly and efficient
> trial of the case or of other cases in court, and
> (4) bad faith or willfulness in failing to comply
> with the court's order.

<u>Id</u>.  Here, the lateness of the effort by plaintiffs to add or substitute

Darnell as their expert has undermined the ability of the court to cure

plaintiffs' problem, ameliorate the obvious prejudice to defendants

and preserve the orderly and efficient trial of this case.  The pretrial

order is done, discovery is closed, and Judge Nottingham is set to

schedule the trial in this matter.  Plaintiffs are asking for the

equivalent of a "do over," and their request simply has come too late.

*See, e.g.,* <u>Mounger v. Goodyear Tire & Rubber Co.</u>, 2000 WL

1466198 *3 (D.Kan. 2000) (expert report stricken for failure to

comply with the disclosure requirements of Fed.R.Civ.P. 26(a)(2)(B)).

Plaintiffs argue that Rule 26 "allows the disclosure of experts at

least 90 days before trial," citing Federal Rules of Civil Procedure

26(a)(2)(c).  However, the preceding text of that rule states that

expert disclosures may be made within 90 days of trial "[i]n the

44

absence of other directions from the court. . . ." Fed.R.Civ.P.

26(a)(2)(c).  When the court sets deadlines for the designations of

experts, as has been done in this case in the Scheduling Order, the

disclosures of experts is to be accomplished in accordance with the

terms of the Scheduling Order, and not according to the time

allowed by the rule.  This is the procedure that is followed for

virtually all cases that are filed in this district.

Plaintiffs argue that a refusal by the court to allow them to add

Darnell as an expert would result in a "manifest injustice."  Pltfs'

Mtn Am. at 2.  At this point, Judge Nottingham is the only party who

can determine whether manifest injustice can only be avoided

through the granting of plaintiffs' motion.  I decline to make such a

finding.

## CONCLUSION

It is therefore ORDERED as follows:

1.  Defendants' Motion to Exclude the Testimony of Plaintiffs' Expert Witness

Jerry Boswell from Trial [filed March 1, 2005] is GRANTED.

2.  Plaintiffs' Motion to Amend Preliminary Pretrial Order and to Name an

Additional Expert Witness [Doc. 75, Filed August 17, 2005] is DENIED.

3.  Defendants' Motion for a Hearing on Motion to Exclude Testimony [Doc. 73-

1, filed August 16, 2005] is DENIED AS MOOT.

Dated at Denver this day of September 8, 2005

BY THE COURT:


s/ O. Edward Schlatter
_____
O. Edward Schlatter
U.S. Magistrate Judge